# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ERAN JOSEPH McMANEMY,

      Plaintiff,

vs.                                                                          No. 2:13-CV-00422-WJ/CG

THE ROMAN CATHOLIC CHURCH OF THE
DIOCESE OF WORCESTER, aka The Diocese of
Worcester, a Massachusetts corporation, et al.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER GRANTING DIOCESAN DEFENDANTS' MOTIONS TO DISMISS BASED ON LACK OF PERSONAL JURISDICTION</u>

THIS CASE involves claims of severe sexual abuse and molestation perpetrated upon Plaintiff Eran Joseph McManemy ("Plaintiff") in the early 1990's by several Roman Catholic priests when Plaintiff was a minor child living in Alamogordo, New Mexico and attending church at Saint Jude Catholic Parish ("St. Jude") in Alamogordo. Plaintiff filed a separate state court lawsuit against those Roman Catholic diocesan entities located in New Mexico and filed this federal lawsuit against Defendants all of which are Roman Catholic diocesan entities located outside of New Mexico.  Subject matter jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

Defendants, with the exception of the New Orleans Province of the Society of Jesus, assert that this Court lacks personal jurisdiction over them.  Accordingly, motions to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) were filed by Defendant Diocese of Amarillo (Doc. 31) on 7/12/2013; Defendant Diocese of San Angelo (Doc. 35) on 7/15/2013; Defendant Archdiocese of Denver (Doc. 43) on 7/26/2013; Defendant Diocese of Worcester

(Doc. 57) on 8/12/2013; and Defendant Diocese of El Paso (Doc. 28) on 7/12/2013.[1] Parties have advised the Court that Plaintiff and Defendant Diocese of El Paso have reached a settlement, but the Court includes facts pertinent to this Defendant for context where necessary. Furthermore, Defendants Archdiocese of Denver and Diocese of Worcester also included motions to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) in their respective pleadings.

After a thorough examination of the Plaintiff's theories to establish personal jurisdiction, the Court finds that none of the moving Defendants have contacts with the forum state of New Mexico sufficient to subject these Defendants to the jurisdiction of the Court. Therefore, the Court GRANTS Defendants' 12(b)(2) motions to dismiss for lack of personal jurisdiction. As a result of the Court's ruling on the 12(b)(2) motions, the 12(b)(6) motions to dismiss for failure to state a claim are denied as moot.

## BACKGROUND

A motion to dismiss is the appropriate procedural vehicle for resolving a personal jurisdiction challenge by a defendant. *See* Fed.R.Civ.P. 12(b)(2). While such a motion is filed by the defendant, the plaintiff is the party with the burden of establishing personal jurisdiction over a defendant. *Kuenzle v. HTM Sport Und-Freizeitgerate AG,* 102 F.3d 453, 456 (10th Cir. 1996). Affidavits and similar evidentiary matter may be presented and are freely considered on a motion attacking jurisdiction. *See Sunwest Silver, Inv. v. Int'l Connection, Inc.*, 4 F.Supp.2d 1284, 1285 (D.N.M. 1998); *Jones v. 3M Company*, 107 F.R.D. 202, 204 (D.N.M. 1984). When such evidence is presented to support personal jurisdiction, the plaintiff need only make a prima facie showing, *Kuenzle*, 102 F.3d at 456, and the district court must resolve all factual disputes in favor of the plaintiff. *Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1075 (10th Cir. 1995).

---

[1] Defendants Diocese of El Paso, San Angelo, and Archdiocese of Denver filed amended motions to dismiss for lack of jurisdiction on 10/07/2013 (Doc. 118), 10/25/2013 (Doc. 138), and 10/25/2013 (Doc. 139) respectively.

Turning to the instant case, Plaintiff's Complaint, First and Second Amended Complaints, Responses to the Motions to Dismiss and attachments thereto all contain horrific allegations of sexual abuse and molestation by former priest David Holley ("Holley") perpetrated upon Plaintiff and numerous other unnamed young boys in Catholic dioceses located in various states. Additionally, the Court conducted a Google search of "Father David Holley" which reveals a plethora of information about Holley and the young boys he molested in multiple dioceses in multiple states over multiple decades. Information sources include major television and print media organizations in and outside of New Mexico and these sources disclosed that in 1993 Holley was sentenced to 275 years in prison for sexually molesting young boys. Holley died in prison in 2008. While Defendants' objected to Holley's affidavit and other attachments submitted by Plaintiff, Defendants' objections are overruled as moot since the Court is granting their motions to dismiss.

## I.     Facts Regarding Plaintiff and Diocesan Defendants

Plaintiff was born in October of 1978 in Albuquerque and is still a resident of New Mexico. In 1987, at the age of nine, Plaintiff and his grandparents moved to Alamogordo, New Mexico and joined St. Jude, a Catholic Church within the jurisdiction of the Diocese of Las Cruces.[2] There, Plaintiff became an altar boy for Father Wilfred Diamond ("Diamond") who was the parish priest of St. Jude. Plaintiff states in his complaint that he was sexually molested by Diamond on numerous occasions until Diamond retired in 1988.

In approximately 1990, Father Daniel Barfield ("Barfield") was appointed permanent pastor of St. Jude. Plaintiff asserts he was also sexually abused by Barfield who was responsible for inviting Holley to stay as a guest in the St. Jude facility. Plaintiff recounts being physically

---

[2] Prior to 1982, the Diocese of El Paso had jurisdiction over St. Jude. With the establishment of the Diocese of Las Cruces in 1982, the Diocese of El Paso moved out of and severed its ties to any parishes within the state of New Mexico. As a result, St. Jude came under the jurisdiction of the Diocese of Las Cruces.

restrained by Barfield while at the same time being sexually molested and raped by Holley.  In 1991, Plaintiff moved back to Albuquerque.  While Plaintiff has asserted he was sexually molested by Holley, Barfield and Diamond, Holley was the only former priest who had any association with the Diocesan Defendants in this lawsuit.

Holley was a priest incardinated[3] to the Diocese of Worcester since 1967. At that time, Bishop Bernard Flanagan ("Bp. Flanagan") was the bishop of the Diocese of Worcester. In the early 1960's, Bp. Flanagan received reports that Holley had sexually molested boys in various parishes. The diocese sent Holley to local mental health practitioners to receive treatment for his sexual disorder. Thereafter, Bp. Flanagan refused to let Holley return to active ministry in the Diocese of Worcester. Instead, Bp. Flanagan attempted to secure an assignment for Holley in the Diocese of Wilmington, Delaware, which declined to accept Holley.

In 1971, Bp. Flanagan sent Holley to receive more treatment at the Servants of the Paraclete in Jemez Springs, New Mexico, a New Mexico Catholic Religious Order affiliated with the Archdiocese of Santa Fe. Once in New Mexico, Holley received parish assignments within the Archdiocese of Santa Fe.

In 1972, Holley received permission from the Diocese of Worcester to perform priestly duties at St. Jude in Alamogordo, which at the time was within the jurisdiction of the Diocese of El Paso. Upon Diamond's request in mid-1975 that Holley stay at St. Jude for longer periods of time, Holley worked at St. Jude continuously for nearly four years. During that time, additional allegations of sexual abuse by Holley surfaced.  Holley was transferred to be an assistant pastor at the Catholic Church of St. Raphael in El Paso, Texas, a parish of the Diocese of El Paso.

---

[3] A Catholic priest is incardinated when he is placed under the religious jurisdiction of an archdiocese or diocese. *See* Doc. 43 at 9 (citing Fryar Aff., ¶ 17).

In April 1976, a priest of St. Raphael Church terminated Holley's assignments with the Diocese of El Paso due to Holley's relapse. Subsequently, the bishop of the Diocese of El Paso appointed Holley to work at the Church of Our Lady of the Valley of El Paso, Texas, which is another parish of the Diocese of El Paso. When Holley committed acts of sexual misconduct, the bishop terminated Holley's priestly faculties in his diocese.

In 1977, Holley transferred to the Diocese of San Angelo. He worked there for four years before the bishop of the Diocese of San Angelo dismissed Holley due to his acts of sexual molestation of young boys.

In 1984, Holley transferred to the Diocese of Amarillo to work at St. Joseph Church until he was dismissed in late 1984, presumably because of his relapse. Holley then transferred to the jurisdiction of the Archdiocese of Santa Fe, which assigned him to serve as a chaplain at St. Joseph Hospital and Vista Sandia Hospital in Albuquerque, New Mexico.

In 1987, Holley transferred to the Archdiocese of Denver to work as a Catholic chaplain at St. Anthony Hospital Central in Denver, Colorado. The Archdiocese of Denver revoked Holley's priestly faculties sometime in 1988, again presumably due to his relapse. There is nothing in the record indicating that Holley worked again as a priest.

## DISCUSSION

In view of the challenges to personal jurisdiction, the following are issues common to all moving Defendants.

## I. Whether Further Jurisdictional Discovery Should Be Allowed

"When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Sizova v. Nat'l Inst. of Standards and Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002). "The trial court, however, is vested with broad

discretion and should not be reversed unless discretion is abused." *Bell Helicopter Textron, Inc. v. Heliqwest Intern., Ltd.*, 385 F.3d 1291 (10th Cir. 2004). A court abuses its discretion if denial of discovery prejudices a litigant. *Sizova*, 282 F.3d at 1326. However, the district court is not "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." *Martinez v. Cornell Corr. of Tex.*, 229 F.R.D. 215, 218 (2005). Rather, discovery is meant to "allow the parties to flesh out allegations for which they initially have at least a modicum of objective support." *Martinez*, 229 F.R.D. at 218. This means that before a court grants discovery, a plaintiff must first provide some reasonable allegations on which to base the pursuit of discovery.

Here, Plaintiff requests discovery hoping to gather facts that will support a prima facie case of civil conspiracy between Holley and the Defendants. Plaintiff seeks to extend Holley's jurisdictional contacts to the out-of-state Defendants so that the Court may exercise personal jurisdiction over the Defendants. *Santa Fe Tech., Inc. v. Argus Networks, Inc.*, 131 N.M. 772, 784 (Ct. App. 2001) (stating that conspiracy theory of personal jurisdiction is "premised on the concep[t] that jurisdictional contacts of one in-state conspirator may be imputed to a non-resident coconspirator…"), *cert. denied*, 131 N.M. 737 (2002).

For the reasons stated below, the Court denies Plaintiff's request for discovery.

A.  The Conspiracy Theory of Personal Jurisdiction

To base personal jurisdiction on a conspiracy theory, "the plaintiff must offer more than 'bare allegations' that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1069 (10th Cir. 2013). 2013). This ensures that personal jurisdiction is based neither on "random" or "fortuitous" contacts nor on "the unilateral activity of another party or third person." *Santa Fe Tech., Inc.*,

6

131 N.M. at 785. A plaintiff makes a prima facie showing of conspiracy when he demonstrates demonstrates "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." *Ettenson v. Burke*, 130 N.M. 67, 72 (Ct. App. 2000), *cert. denied*, 130 N.M. 153 (2001)).

The first element of civil conspiracy requires a "meeting of the minds" among the alleged co-conspirators. *See Melea*, 511 F.3d at 1070 (finding that a defendant's act of simply deferring to the other defendant's judgment did not constitute a "meeting of the minds"). Under the second element, the alleged wrongdoing must be an "independent, unlawful act…that would give rise to a civil action on its own." *Ettenson*, 130 N.M. at 72. Such acts are limited to "tortious acts committed by one of the conspirators" because "a civil conspiracy by itself is not actionable, nor does it provide an independent basis for liability unless a civil action in damages would lie against one of the conspirators." *Id.* Finally, the last element requires proof that the alleged wrongdoing was a proximate cause of the harm resulting to the plaintiff. *Cain v. Champion Window Co. of Albuquerque, LLC*, 142 N.M. 209 (Ct. App. 2007).

B.  Plaintiff's Conspiracy Allegations

The Plaintiff alleges in his second amended complaint that Defendants conspired to (1) cover-up Holley's criminal sexual acts, (2) be negligent,[4] and (3) defraud Plaintiff and his family.[5]

---

[4] Plaintiff lists a number of omissions by Defendants which essentially boil down to allegations of negligence.  For example, Plaintiff claims Defendants "failed to heed warnings of experts," protect children, and report Holley to secular criminal authorities.

[5] To support the application of the conspiracy theory of personal jurisdiction, Plaintiff relies on two cases from the jurisdictions of Delaware and Illinois. *See Instituto Bancario Italiano SpA v. Hunter Engineering Co., Inc.*, 449 A.2d 210 (Del. Sup. Ct. 1982); *see also Cameron v. Owens-Corning*, 695 N.E.2d 572 (Ill. App. 1998).

*Conspiracy to Cover-Up Holley's Criminal Sexual Acts*

First and foremost, Plaintiff claims that Defendants conspired "to cover up Holley's criminal sexual acts," which is another way to say Defendants conspired to violate New Mexico's criminal statute of "harboring or aiding a felon" without actually mentioning the statute. N.M.S.A. 1978, § 30-22-4.[6] Plaintiff had explicitly asserted in all but one of his responses to the motions to dismiss that Defendants conspired to violate this criminal statute.[7] When Defendants pointed out that a civil conspiracy may not be premised on a criminal statute, Plaintiff submitted his Memorandum in Opposition to Defendant Diocese of Worcester's Motion to Dismiss omitting all reference to the statute, yet leaving intact the language of the original criminal allegation. Even if Plaintiff asserted that his claims were not based on the criminal statute, he has failed to explain how covering up criminal sexual acts constitutes a tortious act on which to base his civil conspiracy claim.

*Conspiracy to be Negligent*

Plaintiff claims that Defendants conspired to be negligent.[8] A negligence claim requires "the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 134 N.M. 43, 47-8 (2003). The New Mexico Supreme Court stressed that "negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Id.*

---

[6] "Harboring or aiding a felon consists of any person…who knowingly conceals any offender or gives such offender any other aid, knowing that he has committed a felony, with the intent that he escape or avoid arrest, trial, conviction or punishment…Whoever commits harboring or aiding a felon is guilty of a fourth degree felony."
[7] *See* Doc. 53, pg. 13 (San Angelo); Doc. 52, pg. 13 (El Paso); Doc. 56, pg. 13, ¶ 44 (Denver); Doc. 51, pg. 14 (Amarillo).
[8] The Court's initial reaction is that *intentional* negligence is an oxymoron, in that negligence cannot be based on an intentional act. *See Ettenson v. Burke,* 130 N.M. 67, 75 (N.M.App. 2000) (describing civil conspiracy as "achieving an unlawful purpose *or using an unlawful means to achieve a lawful goal*") (*emphasis added*).

The Court fails to see how Plaintiff can maintain a claim of conspiracy to be negligent when he fails to allege a viable claim of negligence.  Plaintiff's negligence claim fails at the first element because he has not alleged any facts that show Defendants were ever aware of Plaintiff's existence or that Defendants had reason to know Holley would travel to New Mexico in 1990 where he molested the Plaintiff.  Thus, Plaintiff has not established that Defendants owed any duty to him.  Further, the facts pled by Plaintiff show that he was born in 1978, some nine years after the Diocese of Worcester first sent Holley to New Mexico for treatment at the Servants of the Paraclete.  Holley ended his employment with the Diocese of El Paso in 1977, the year before Plaintiff was born. After the Archdiocese of Denver dismissed Holley in 1988, there are no more facts suggesting Holley either communicated with or resumed work as a priest for any of the Diocesan Defendants. According to Plaintiff's Second Amended Complaint, Holley traveled to Alamogordo, New Mexico in 1990 "…at the invitation of Father Barfield…"[9] and not because he was directed there by any of the diocesan Defendants.  Therefore, Plaintiff has not only failed to establish a duty, he has also failed to show causation.  Plaintiff's failure to present a viable negligence claim negates his underlying conspiracy claim.

*Conspiracy to Defraud*

The same problem persists in Plaintiff's claim that Defendants conspired to defraud the Plaintiff and his family by making misrepresentations that the "Clergymen Predators were rehabilitated, trustworthy and/or religiously scrupulous, and by intentionally withholding their actual knowledge of the contrary."[10] Again, to state a valid claim of civil conspiracy to defraud, the Plaintiff must first make a valid claim of fraud. A major component of fraud requires the

---

[9] Plaintiff's Second Amended Complaint (Doc. 109, pg. 10).
[10] Plaintiff's Second Amended Complaint (Doc. 109, pg. 18).

inducer to make a misrepresentation to the plaintiff on which the plaintiff detrimentally relies.[11] Without such targeted misrepresentation, there can be no proximate cause between the inducer's act (the misrepresentation) and the injury to plaintiff. *Cain*, 142 N.M. at 217-18.

It makes no sense for Plaintiff to assert that he relied on Defendants' misrepresentations when Plaintiff fails to allege any facts showing that (1) Defendants knew of Plaintiff's existence or that (2) Defendants had reason to know Holley would visit New Mexico in 1990. Stated another way, Defendants could not have made misrepresentations to an unforeseeable plaintiff. Plaintiff has failed to supply the requisite underlying fraud claim, much less a claim of conspiracy based on fraud.

The Court also notes that the assertion of any conspiracy claim to establish jurisdiction may not do away with the minimum contacts requirement.   In a Colorado case discussing Colorado's jurisdictional long arm statute,[12] the Tenth Circuit cautioned against "confus[ing] the standards applicable to personal jurisdiction and those applicable to liability," explaining that due process requires the out-of-state Defendants themselves to have minimum contacts with the forum state. *Melea, Ltd.*, 511 F.3d at 1070. As with the Colorado law, the New Mexico long-arm statute also extends the jurisdictional reach of New Mexico courts as far as constitutionally permissible. *Tercero v. Roman Catholic Diocese of Norwich*, 132 N.M. 312, 316 (2002); *see* N.M. STAT. ANN. § 38-1-16 (1978). Accordingly, even if the Plaintiff had made the factual allegations necessary to construct a viable claim of conspiracy, Plaintiff's theory would still fail

---

[11] Elements of fraud include, "(1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Cain*, 142 N.M. at 217.

[12] Colorado long-arm statute "'confer[s] the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions,' and its requirements are necessarily addressed under a due process analysis…[t]he due process analysis of personal jurisdiction under the Colorado Constitution is identical to [the fair play and substantial justice tests] performed by federal courts under the United States Constitution." *Melea, Ltd.*, 511 F.3d at 1065.

because Defendants have no minimum contacts with the state of New Mexico, as discussed below.

Lastly, Plaintiff fails to specifically identify what information he seeks to discover. *See Blake v. Blake*, 102 N.M. 354, 359 (Ct. App. 1985) (stating that non-specific and speculative requests for discovery are valid grounds to deny discovery because they amount to a "fishing expedition"). In his request for discovery (Doc. 95), Plaintiff states that "…any additional facts revealed through discovery will only confirm the conspiracy among the Defendants already described above, which permits jurisdiction over each Defendant in New Mexico…" followed by a list of legal conclusions and undisputed facts in which he maintains discovery "will further reveal in more detail." Granting discovery so that the Plaintiff may find facts which would then equip him to make the missing allegations and to confirm his unfounded legal conclusions would undoubtedly be the archetype of a fishing expedition.

Accordingly, because Plaintiff has failed to assert a colorable independent basis for liability based on conspiracy, and because Plaintiff has failed to identify the jurisdictional information he wishes to find through discovery, the Court DENIES Plaintiff's request for further discovery.

## II.   Whether There Are Sufficient Minimum Contacts for Personal Jurisdiction

**Legal Standard**

A New Mexico court may only exercise personal jurisdiction over a non-resident defendant if three conditions are satisfied. *Salas v. Homestake Enter., Inc.*, 106 N.M. 344, 345 (1987). First, the defendant must have engaged in one of the acts enumerated in New Mexico's jurisdictional long-arm statute. N.M. STAT. ANN. § 38-1-16 (1978). Under the long-arm statute, a person submits himself to personal jurisdiction in New Mexico if he transacts any business in the

state, or if he commits a tortious act within the state. *Id.* Second, the plaintiff's cause of action must arise from one of those acts. *Salas*, 106 N.M. at 345. Finally, the defendant must have minimum contacts with New Mexico sufficient to satisfy constitutional due process. *Id.*

New Mexico courts have repeatedly equated the first and third conditions. Because New Mexico's long arm statute extends the jurisdiction of New Mexico courts as far as constitutionally permissible, the inquiry into whether specific conduct falls under the statute becomes subsumed by the constitutional due process inquiry. "The question of personal jurisdiction over out-of-state residents involves more than a technical 'transaction of any business' or the technical 'commission of a tortious act' within New Mexico. The meaning of those terms, in our statute, is to be equated with the minimum contacts sufficient to satisfy due process." *Tarango v. Pastrana*, 616 P.2d 440, 441 (N.M. Ct. App. 1980).

To satisfy Due Process requirements, the defendant must have (1) sufficient minimum contacts with the forum state (2) such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

A plaintiff satisfies the "minimum contacts" standard by showing that the court may exercise either general or specific jurisdiction over the defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).[13] To establish specific jurisdiction, the plaintiff must show that the defendant "purposefully directed" his activities at residents of the forum, and that the plaintiff's injuries "arise out of or relate to" those activities. *Burger King*

---

[13] General jurisdiction exists where the non-resident defendant's contacts with the state are so "continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011). Courts impose a "high burden" to establish the minimum contacts necessary for general jurisdiction. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1080-81 (10th Cir. 2004). Here, general jurisdiction is not applicable because none of the moving Defendants had continuous and systematic contacts with the state of New Mexico at or near the time of Plaintiff's injury.

*Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). A defendant "purposefully directs" activities in a forum where the defendant makes (a) an intentional action that was (b) expressly aimed at the forum state (c) with knowledge that the brunt of the injury would be felt in the forum. *Shrader v. Biddinger*, 633 F.3d 1235, 1239-40 (10th Cir. 2008). This ensures that an out-of-state defendant is not bound to appear in the forum to account for merely "random, fortuitous, or attenuated contacts" with the forum. *Burger King Corp.*, 471 U.S. at 475.

A.  Personal Jurisdiction and Minimum Contacts

The facts of this case closely resemble those in *Tercero v. Roman Catholic Diocese of Norwich*, 132 N.M. 312 (2002). There, the plaintiff ("Tercero") brought suit in state court in New Mexico against the Diocese of Norwich, a Catholic diocese in Connecticut, alleging that a priest incardinated within that diocese sexually molested Tercero. The facts in Tercero are illustrative.  In 1963 after reports of inappropriate contact with boys, the priest in Tercero was sent by his bishop to the Servants of the Paraclete in New Mexico for treatment with expenses paid by the Diocese of Norwich.  The priest returned to Connecticut in 1964 and was informed by his bishop that he could no longer function as a priest in the Diocese of Norwich.  Although the priest was never formally excardinated,[14] the priest was encouraged to find a "benevolent bishop" in another diocese. *See id.* at 315-16. Subsequently, the priest decided by himself to return to the Servants of the Paraclete and was transferred to an affiliated facility in Minnesota. The Diocese of Norwich paid for the priest's stays at the Servants of the Paraclete and in Minnesota.  *Id.*  In 1996, the priest obtained permission from his bishop to return to New Mexico and upon his return, the priest met with the Archbishop of Santa Fe and was assigned to St. Anne's Parish in New Mexico.  *Id.*  He remained at St. Anne's until 1968 when he was dismissed by the Diocese of Santa Fe for acts of sexual molestation for the period 1966-68.  *Id.*  Following

_____

[14] A member of the clergy is excardinated when he is freed from one jurisdiction and is transferred to another.

his dismissal, the priest returned to the Servants of the Paraclete where he again underwent treatment paid for by the Diocese of Norwich.  *Id.*

In finding that the Diocese of Norwich did not purposefully avail itself to the forum state, New Mexico, the New Mexico Supreme Court emphasized the following points: (1) the bishop's act of encouraging the priest to find a benevolent bishop is not tantamount to sending the priest to New Mexico; (2) this encouragement arose and was concluded by 1963, about three years before the alleged abuse; (3) this three year "passage of time vitiated any causal link between any activity"[15] in New Mexico by the diocese and the injury to Tercero; (4) the priest decided in his own capacity to visit New Mexico; and (5) during the actual time period of the alleged abuse, the diocese hardly had any control over the priest. Hence, the *Tercero C*ourt held that when the priest returned to New Mexico out of his own decision around three years after his diocese engaged in an act targeted at the forum, the Diocese of Norwich did not purposefully avail itself to New Mexico and therefore, had no minimum contacts with the forum state. *See Id.* (stating that the diocese was "not transacting business in New Mexico at, or near, the time of the alleged acts sufficient to exercise long-arm jurisdiction consistent with constitutional considerations of due process").

Turning to the instant case, although Holley was never excardinated from the Diocese of Worcester, Bp. Flanagan refused to permit Holley to work in his diocese. The Diocese of Worcester did send Holley to New Mexico in 1971, but that was seventeen years before he sexually molested the Plaintiff. Under *Tercero*, seventeen years is clearly sufficient time to sever any causal link between the diocese's purposefully directed activity and the harm to the Plaintiff. Also, there are no facts suggesting that Holley communicated with any diocesan Defendant after he was dismissed by the Archdiocese of Denver in 1988. Instead, Holley independently decided

---

[15] *Tercero*, 132 N.M. at 319.

to visit Alamogordo, New Mexico in 1990 where he molested the Plaintiff. In addition, the facts fail to show that the other diocesan Defendants had any significant contacts whatsoever with New Mexico.[16] Because the Defendants had not purposefully directed activities to New Mexico at or near the time of the abuse that would have left intact a causal link between the act and the injury, the Court finds that the Defendants have no minimum contacts with this forum state under this theory.

B.   Plaintiff's Additional Theories to  Establish Minimum Contacts

Plaintiff also raises the following additional theories in an effort to establish minimum contacts.

*Stream of Commerce Theory:* Under the Plaintiff's stream of commerce theory, the Defendants purposefully availed themselves of the protections and benefits of New Mexico by employing Holley, a pedophiliac. Plaintiff asserts that each Defendant harbored Holley from prosecution before placing the "defective priest product" back into the stream of commerce with the intent to distribute Holley to another Catholic entity.

Even assuming that this Court adopts the stream of commerce theory to establish personal jurisdiction, the theory fails under the facts given. In *J. McIntyre Machinery, Ltd. v. Nicastro*, the United States Supreme Court clarified that the key inquiry in finding minimum contacts in cases premised on the stream of commerce metaphor is whether the defendant "purposefully availed itself of the privilege of conducting activities within the forum State…" 131 S.Ct. 2780, 2788 (2011) (stating that the "defendant's transmission of goods permits the

---

[16] The Court recognizes that the Diocese of El Paso had presence in New Mexico prior to 1982. However, Plaintiff has made no allegations that the Diocese of El Paso maintained any ties with New Mexico between 1982 and 1990. The passage of eight  years without any significant contact with the state of New Mexico is sufficient time to sever the diocese's continuous and systematic contacts with the forum state.

exercise of jurisdiction only where the defendant can be said to have targeted the forum…it is not enough that the defendant might have predicted that its goods will reach the forum State").

Defendants' act of employing Holley in their respective states is not equivalent to targeting their activities to New Mexico. Even if Plaintiff claims that it was foreseeable that Holley would return to New Mexico after Defendants dismissed him from employment, *Nicastro* stresses that purposeful availment, rather than foreseeability, is the proper test to find minimum contacts. *See* 131 S.Ct. at 2789 (stating that "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment"). Because Defendants did not direct any other activities to New Mexico at or near the time of the abuse, the Court finds there are no minimum contacts under this theory.

*Agency Theories*: Plaintiff also provides the following agency theories to assert minimum contacts: (1) that Defendants are vicariously liable for Holley's actions committed within the scope of his employment and that sexually abusing children is within the scope of a priest's employment; (2) that Defendants negligently supervised  Holley by failing to control him; and (3) that there exists a special relationship between a Catholic entity and a member of the Catholic community that gives rise to a duty to warn the Catholic community and report criminal activity to local authorities.

However, these agency theories fail under the facts in this case. The first and second theories presume that Holley had an employer-employee relationship with all of the diocesan Defendants at the time Holley sexually abused the Plaintiff. However, Holley was dismissed from employment by each diocesan Defendant at least two years before he independently went to New Mexico and abused the Plaintiff. That is sufficient time to sever any causal link between Defendants' alleged acts and Plaintiff's injury. *Tercero*, 132 N.M. at 319. Moreover, acts of

abuse by priests are not within the scope of their employment. *Id.* at 320 (noting that "obviously…the alleged abuse…was never within the scope of [a priest's] employment").

In regards to Plaintiff's third agency theory, it would be unreasonable to claim that the out-of-state Defendants have a special relationship with the Catholic community in New Mexico as to give rise to a duty to protect New Mexican parishioners, especially when Defendants ceased to have any relationship with Holley by 1988. Based on these agency theories, there are no minimum contacts.

### III. Worcester and Denver's Motions to Dismiss for Failure to State a Claim in which Relief Can Be Granted

In light of the Court's ruling that there is not personal jurisdiction over the diocesan Defendants, the issues presented by Defendants Diocese of Worcester and Archdiocese of Denver's motions to dismiss for failure to state a claim are denied as moot.

### CONCLUSION

Because Defendants do not have sufficient minimum contacts with the forum state of New Mexico under any of Plaintiff's theories, there is no personal jurisdiction over any moving Defendant. Accordingly, the Court hereby GRANTS all diocesan Defendants' Motions to Dismiss for Lack of Personal Jurisdiction.

**SO ORDERED**.

_____

UNITED STATES DISTRICT JUDGE